**Opinion issued June 11, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00388-CV

_____

**$132,265.00 IN U.S. CURRENCY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 49473**

---

## O P I N I O N

This is an appeal from a civil forfeiture proceeding under chapter 59 of the

Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. arts. 59.01−.14 (West

2006 & Supp. 2012). In two issues, Charles Ejekute-Obi, a licensed pharmacist

from whom $132,265 was forfeited as proceeds gained from the unlawful dispensing of narcotics, contends the State presented (1) legally insufficient evidence of the commission of a felony offense that would justify the forfeiture and (2) factually insufficient evidence that the currency forfeited was contraband. We affirm.

## Background

Police arrested Ejekute-Obi in October 2008 after he filled written prescriptions presented by an undercover officer for 5,310 tablets of hydrocodone and 3,600 tablets of Xanax at his pharmacy, Empirical Pharmacy. Ejekute-Obi charged $3,920 for the prescriptions and requested an $80 tip from the undercover officer. Police estimated the street value of the hydrocodone and Xanax dispensed by Ejekute-Obi at more than $45,000.

Sergeant T. Gamble, a supervisor for the pharmaceutical squad of the Houston Police Department's narcotics division, and HPD Officer J. Kowal, a member of the narcotics division, both testified that HPD began an undercover investigation and surveillance of Ejekute-Obi after receiving a confidential informant's tip that Ejekute-Obi was dispensing narcotics without a valid medical purpose. Three HPD officers, including Sergeant Gamble and Officer Kowal, testified that the confidential informant had provided their unit with reliable information in the past.

2

During surveillance, Officer Kowal observed a man and woman driving a vehicle with Louisiana license plates enter Ejekute-Obi's pharmacy with two empty duffel bags; when the man and woman left fifteen minutes later, the duffel bags were full. Police conducted a traffic stop, searched the vehicle, and discovered that the duffel bags contained thousands of tablets of hydrocodone and Xanax and almost $4,000 in cash. The two Louisiana-based individuals were arrested. On at least two more occasions, police arrested individuals who left Ejekute-Obi's pharmacy with unlawfully dispensed narcotics.

Police continued the surveillance of the pharmacy and decided to set up a sting operation. Police obtained twenty-five prescriptions for twenty-five different people from a licensed physician. Some of the prescriptions were for hydrocodone or Xanax or both, and others included a medication that was not a controlled substance in addition to hydrocodone or Xanax. According to the testimony of Officer Kowal, pharmacists who unlawfully dispense narcotics often require that the prescriptions include medications that are not controlled substances in order to avoid detection by the Drug Enforcement Agency. Kowal also testified that because the potential abuse of controlled substances is well known, most legitimate pharmacists "do their due diligence" to verify the validity of a prescription, including whether it was issued as a result of an actual doctor-patient relationship and for a "medical necessity."

3

On the day of the sting, HPD Officer K. Jacobs went into Ejekute-Obi's pharmacy with a confidential informant who was familiar with the practices there.[1] The confidential informant introduced Jacobs as a friend, and Jacobs presented Ejekute-Obi with all twenty-five prescriptions and a photocopy of an identification card for each purported patient. Ejekute-Obi refused to fill the prescriptions that did not list a medication besides hydrocodone or Xanax. He gave Jacobs a handwritten list of other medications "he typically used when filling prescriptions for controlled substances." Ejekute-Obi specifically pointed out a stool softener.

Jacobs left the pharmacy so that Ejekute-Obi could fill the prescriptions. When she returned, she put the narcotics and other medications in a duffel bag and paid Ejekute-Obi $3,920 plus the $80 tip. More than one officer testified that the amount Ejekute-Obi charged was high. Jacobs also noted the absence of a cash register in the pharmacy, and she testified that Ejekute-Obi did not record the transaction. Jacobs discussed future purchases of hydrocodone and Xanax with Ejekute-Obi. Ejekute-Obi told her to come twice a week and to "make sure that [she] . . . had the prescriptions in order."

Police arrested Ejekute-Obi immediately after Jacobs completed the transaction. During questioning after his arrest, Ejekute-Obi stated that he only worked with cash and did not accept insurance. Sergeant Gamble and Officer

---

[1] The confidential informant who participated in the sting operation was not the same person who initially tipped police off to Ejekute-Obi's practices.

Kowal testified that the pharmacy did not have a cash register, did not have any billing records, was disorganized, and had little medicine on the shelves.

Ejekute-Obi signed a written consent to a search of his home. Officer M. Backas, a narcotics officer and specialist in the area of illegal pharmaceutical sales, transported Ejekute-Obi to the house and assisted with the search. Backus testified that Ejekute-Obi initially informed police that he did not have anything at his home related to the pharmacy; however, when officers discovered $39,710 in cash stuffed in several envelopes along with 2,700 tablets of hydrocodone and 720 tablets of Xanax in unmarked vials in Ejekute-Obi's front closet, Ejekute-Obi informed Backas that the money was from the pharmacy's business. Ejekute-Obi told Backas that he was holding the money at his home because he was going through a divorce and did not want to make regular deposits into a bank account his wife could access. Police did not locate any of the paperwork required for a pharmacist to remove controlled substances from the pharmacy.

Police also discovered $92,555 in a suitcase in Ejekute-Obi's bedroom. The suitcase had Ejekute-Obi's name on it and contained his medical identification card. Officer Backus testified that Ejekute-Obi told him that the suitcase belonged to a Nigerian businessman named "Mr. Uche," who was out of town. In the more than three years following Ejekute-Obi's arrest and the seizure of the $92,555 in cash, Mr. Uche never made a claim for the money.

5

The State filed a civil forfeiture proceeding against the $132,265 in cash found in Ejekute-Obi's home. At the time of the trial, Ejekute-Obi's criminal charges were still pending. After hearing the testimony and considering the evidence, the trial court entered twenty-eight fact findings, including the following:

- Based upon information from a confidential informant (who had provided reliable information in the past to the Houston P. D.) the Houston P. D. conducted surveillance on Empirical on September 29, 2008. During the day, very few customers entered the pharmacy. Late in the afternoon a black male and a black female entered the pharmacy with empty duffel bags. After a few minutes the pair exited the store with full duffel bags. A few minutes later after a traffic stop, the duffel bags were found to contain 9,000 tablets of hydrocodone and Xanax, plus cash.

- On October 20, 2008, an undercover Houston P. D. officer entered Empirical with 25 prescriptions in 25 different patients' names. Each prescription was for Hydrocodone (a penalty group three controlled substance) in 90 tablet quantities and Xanax (or Alprazolam, also a penalty group three controlled substance) in 60 tablet quantities. Most prescriptions also included non-controlled substances as well. The prescriptions called for 5,310 tablets of Hydrocodone and 3,600 tablets of Xanax.

- All prescriptions were signed by [a licensed physician].

- [Ejekute-]Obi refused to fill prescriptions which did not have a non-controlled substance in addition to the controlled substance.

- The Houston P. D. knew that this was [Ejekute-]Obi's practice based on information from a prior confidential informant.

- [Ejekute-]Obi filled [the remaining] prescriptions.

- [Ejekute-]Obi and the officer also discussed future transactions in which [Ejekute-]Obi could fill at least 25 prescriptions three to four times per week.

- [Ejekute-]Obi provided the officer with a list of non-controlled substances which could be included on future prescriptions for controlled substances. [Ejekute-]Obi suggested the use of a stool softener.

- All sales by Empirical were for cash, but no cash register was visible in the store.

- [Ejekute-]Obi informed the officer to come twice a week and make sure the prescriptions were in order before coming in again.

The court also made eleven conclusions of law, including the following:

1. Both Texas and federal law recognize that a pharmacist, such as [Ejekute-]Obi, has an affirmative duty only to fill a prescription he knows was issued for a legitimate medical purpose and in the course of professional practice. . . . In this case, [Ejekute-]Obi's violation of this duty under Texas Health and Safety Code section 481.071 serves as the predicate felony offense for the seizure and forfeiture of the U.S. currency at issue. . . .

2. From [Ejekute-]Obi's refusal to fill prescriptions that did not include non-controlled substances, coupled with his providing a list of non-controlled substances and requesting the officer to have his prescriptions in order, this Court can reasonably infer that [Ejekute-]Obi knew that the prescriptions were not issued for legitimate medical purposes.

3. Because all prescriptions were so similar, [Ejekute-]Obi would have a responsibility to make sure each and every prescription was valid.

. . .

7

5. Although there is no evidence as to what portion of the money can be attributed to non-controlled substances, a wrong-doer may not commingle funds derived from the commission of a felony with funds derived from lawful endeavors, and argue the taint is removed.

6. Based upon prior surveillance, the filling of fictitious prescriptions was not an isolated circumstance in this case. The State established that there is a reasonable belief that there is a substantial connection of the property to be forfeited and the criminal activity.

7. The State proved that it was more probable than not that the seized property was intended for use in, or derived from, a violation of the offenses enumerated in the foreclosure statute[.]

. . .

10. Based on the large amount of controlled substances prescribed coupled with the suspicious circumstances under which [Ejekute-]Obi dispensed them requires this Court to conclude that [Ejekute-]Obi knew these narcotics were being sold without a legitimate medical purpose.

11. Based on [Ejekute-]Obi's admission that the substantial proceeds in the front closet were store proceeds, the lack of cash registers or other means to record or keep the proceeds at Empirical, and his admission that he was keeping money at home because of his divorce, this Court can reasonably infer that all proceeds in the house were from sales of controlled substances from Empirical or from sales of controlled substances like those found in his house. Because more than 3 years have elapsed, and Mr. Uche has made no claim on the property in the suitcase, this Court concludes that Mr. Uche has no interest in the funds in the suitcase and that [Ejekute-]Obi was not being truthful in his statements pertaining to Mr. Uche or the funds in the suitcase.

Therefore, the Court finds that the ONE HUNDRED THIRTY-TWO THOUSAND TWO HUNDRED SIXTY-FIVE AND NO/100 DOLLARS ($132,265.00) in currency money of the United States at issue in this proceeding are the proceeds gained

from the commission of a felony under Chapter 481 of the Texas Health and Safety Code, and should be forfeited to the State of Texas, subject to disposition under article 59.06 of the Texas Code of Criminal Procedure.

(Citations omitted).

## Forfeiture

Chapter 59 of the Code of Criminal Procedure authorizes the forfeiture of contraband, which is defined to include the proceeds gained from the commission of any felony under chapter 481 of the Health and Safety Code (the Controlled Substances Act). *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i), (D); *see also State v. $11,014.00*, 820 S.W.2d 783, 784 (Tex. 1991) ("Money is subject to forfeiture if it is derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance."). Forfeiture proceedings under chapter 59 are civil in nature. TEX. CODE CRIM. PROC. ANN. art. 59.05(b).

To prevail in a forfeiture proceeding, the State must satisfy a two-part test. First, the State must show probable cause, or "a reasonable belief that 'a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute.'" *State v. $90,235.00 in U.S. Currency*, 390 S.W.3d 289, 293 (Tex. 2013) (quoting *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 661 (Tex. 1987)). "It is that link, or nexus, between the property to be forfeited and the statutorily defined criminal activity that establishes probable cause, without which

the State lacks authority to seize a person's property." *$56,700 in U.S. Currency*, 730 S.W.2d at 661.

Second, the State must prove by a preponderance of the evidence that the seized property is contraband and therefore subject to forfeiture. *See* TEX. CODE CRIM. PROC. ANN. art. 59.02(a); *$18,800 in U.S. Currency v. State*, 961 S.W.2d 257, 260 (Tex. App.—Houston [1st Dist.] 1997, no writ). When there is no direct evidence showing that the seized property is the fruit of the commission of the statutorily enumerated felonies, the State must present "sufficient circumstantial evidence." *Antrim v. State*, 868 S.W.2d 809, 812 (Tex. App.—Austin 1993, no writ). "When relying on circumstantial evidence, 'the State is required to offer proof which does more than raise a mere surmise or suspicion regarding the source of the currency.'" *Id.* (quoting *Money of the U.S. $8,500 v. State*, 774 S.W.2d 788, 792 (Tex. App.—Houston [14th Dist.] 1989, no writ)). The State is not required, however, to exclude every other possible means by which the currency might have been acquired. *Id.*; *$7,058.84 in U.S. Currency v. State*, 30 S.W.3d 580, 586 (Tex. App.—Texarkana 2000, no pet.).

## A. Standard of Review

In an appeal from a bench trial, we review the legal and factual sufficiency of the evidence supporting a trial court's findings of fact by the same standards we apply to jury verdicts. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996);

*$27,877.00 Current Money of U.S. v. State*, 331 S.W.3d 110, 117 (Tex. App.—Fort Worth 2010, pet. denied). Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test is "whether the evidence . . . would enable reasonable and fair-minded people to reach [the findings] under review." *Id.* at 810. In making this determination, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. We may not substitute our judgment for that of the fact-finder so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822.

When considering a factual-sufficiency challenge, we consider and weigh all of the evidence, not just that which supports the verdict. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *$43,774 in U.S. Currency v. State*, 266 S.W.3d 178, 183 (Tex. App.—Texarkana 2008, pet. denied). We will set aside a finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool*, 715 S.W.2d at 635; *$43,774 in U.S. Currency*, 266 S.W.3d at 183.

**B.**     **Legal Sufficiency**

In his first issue, Ejekute-Obi argues that the evidence is legally insufficient to support the forfeiture because the State failed to prove that he committed a felony by dispensing a controlled substance without a valid medical purpose. Although Ejekute-Obi challenges the legal sufficiency of the evidence under the federal statutes regulating prescription medications, *see* 21 C.F.R. § 1306.04(a),[2] the trial court determined that section 481.071 of the Health and Safety Code served as "the predicate felony offense for the seizure and forfeiture" of Ejekute-Obi's currency. Accordingly, we consider whether the State presented legally sufficient evidence of an offense under section 481.071.

Section 481.071 prohibits, in pertinent part, a pharmacist from dispensing a controlled substance "except for a valid medical purpose and in the course of medical practice." TEX. HEALTH & SAFETY CODE ANN. § 481.071 (West 2010); *see also* TEX. HEALTH & SAFETY CODE ANN. § 481.128 (providing that knowing violation of section 481.071 is state jail felony). There is no dispute that the hydrocodone and Xanax dispensed by Ejekute-Obi were controlled substances. *See*

---

[2]     The federal regulation cited by Ejekute-Obi imposes a duty on a pharmacist to properly dispense a controlled substance. *See* 21 C.F.R. § 1306.04(a). It provides that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *Id.* A pharmacist who fills "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.*

TEX. HEALTH & SAFETY CODE ANN. §§ 481.002(5), 481.104(a)(2), (4). The trial court stated in its conclusions of law that Ejekute-Obi's knowledge that he dispensed the hydrocodone and Xanax without a valid medical purpose could be inferred from "the large amount of controlled substances prescribed coupled with the suspicious circumstances under which [Ejekute-Obi] dispensed them." We agree.

The State presented the following circumstantial evidence that Ejekute-Obi was prescribing hydrocodone and Xanax without a valid medical purpose: (1) police seized thousands of narcotic pills from a Louisiana couple leaving Ejekute-Obi's pharmacy, (2) Ejekute-Obi dispensed a large quantity of narcotics to Officer Jacobs (i.e., prescriptions for twenty-five individuals, none of whom were present and none of whom testified that they were contacted to verify the prescription), (3) Ejekute-Obi refused to fill prescriptions that could be flagged as suspicious by the DEA, (4) Ejekute-Obi provided Jacobs with a list of non-controlled substances for inclusion on future prescriptions, (5) Ejekute-Obi told Jacobs he could fill orders for her twice weekly, (6) Ejekute-Obi charged an amount that more than one police officer testified exceeded the amount charged for valid prescriptions, (7) there was no cash register at the pharmacy, (8) there was only a small quantity of other medicine at the pharmacy, (9) Ejekute-Obi had a large quantity of narcotics in a closet in his home without supporting documentation, (10) Ejekute-Obi had large

13

quantities of cash at his home, and (11) Ejekute-Obi made inconsistent statements about the cash discovered at this home. *Cf. United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (finding that physician did not have valid medical purpose for issuing prescriptions supported by "inordinately large quantity of controlled substances" prescribed, "[l]arge numbers of prescriptions" that were issued, and warnings given by physician to avoid detection).

Viewing this evidence in the light most favorable to the verdict, we hold that "reasonable and fair-minded people" could conclude that Ejekute-Obi knowingly violated section 481.071's prohibition against dispensing controlled substances without a valid medical purpose. *See City of Keller*, 168 S.W.3d at 822. We overrule Ejekute-Obi's first issue challenging the legal sufficiency of the evidence.

## C.    Factual Sufficiency

In his second issue, Ejekute-Obi contends that there is factually insufficient evidence that the $39,710 found in his closet and the $92,555 found in a suitcase in his bedroom were contraband. When determining whether currency is contraband, courts have considered the following factors: (1) the proximity of the money to drugs and evidence of drug trafficking, (2) evidence that the money was previously in contact with drugs, (3) suspicious activity consistent with drug trafficking, (4) the amount of money at issue, and (5) the presence of expert testimony indicating that there was probable cause to seize the property subject to forfeiture, in that a

14

substantial connection exists between the property to be forfeited and the criminal activity. *See Antrim*, 868 S.W.2d at 814; *$24,180 in U.S. Currency v. State*, 865 S.W.2d 181, 184 (Tex. App.—Corpus Christi 1993, writ denied).

Here, the evidence detailed above constitutes evidence that Ejekute-Obi was engaged in suspicious activity that was consistent with unlawfully dispensing narcotics. This case involves both a large amount of narcotics and a large amount of cash, and the evidence of the circumstances under which the cash was seized is undisputed. The evidence showed that (1) Ejekute-Obi's pharmacy business was a cash business without a cash register or any other method of accounting for transactions, (2) Ejekute-Obi admitted that he kept cash from his pharmacy business at his home in order to keep the income out of his divorce proceeding, (3) police discovered $39,710 in a closet in Ejekute-Obi's home along with thousands of hydrocodone and Xanax pills, (4) police did not find paperwork permitting Ejekute-Obi to store the pills at his home, (5) police discovered an additional $92,555 in a suitcase containing Ejekute-Obi's medical identification card, and (6) Ejekute-Obi lied about owning the suitcase containing the $92,555.

The State was not required to exclude every possible way in which Ejekute-Obi could have acquired $132,265 in cash. *See Antrim*, 868 S.W.2d at 812; *Spurs v. State*, 850 S.W.2d 611, 614 (Tex. App.—Tyler 1993, writ denied). We conclude that the uncontradicted evidence of all the circumstances, taken together, supports

15

the trial court's finding that $132,265 in cash was contraband. That is, the trial court's findings that the $39,710 in the closet and the $92,555 in the suitcase was subject to forfeiture was not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. We overrule Ejekute-Obi's second issue challenging the factual sufficiency of the evidence.

## Conclusion

Having concluded that the evidence is legally and factually sufficient to support the forfeiture of $132,265 from Ejekute-Obi as proceeds gained from the commission of a felony under the Health and Safety Code, we affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

16