# NO. 12-16-00211-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TLC HOSPITALITY, LLC,*<br>*APPELLANT* | § | *APPEAL FROM THE 48TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *PILLAR INCOME ASSET*<br>*MANAGEMENT, INC.,*<br>*APPELLEE* | § | *TARRANT COUNTY, TEXAS* |

## *OPINION*

TLC Hospitality, LLC appeals the trial court's judgment for specific performance and a monetary award rendered in favor of Pillar Income Asset Management, Inc. TLC raises eleven issues on appeal. We affirm.

## BACKGROUND

Pillar is a real estate advisory/management company based in Dallas, Texas. On May 7, 2012, Pillar entered into a written contract with TLC to purchase an apartment complex owned by TLC. The contract described the property as street address 3101 Mustang Drive, Grapevine, TX 76051 and made reference to a legal description in an exhibit. But neither that exhibit nor any other exhibit to the contract contained such a description. The contract further set forth that the price for the property was $8,000,000.00 with Pillar's being required to assume $5,700,000.00 of TLC's existing note[1] and pay the difference in cash. The contract also set forth, in pertinent part, as follows:

---

[1] TLC's note was secured by the Department of Housing and Urban Development (HUD).

Within ten (10) business days after the Effective Date, Seller shall request the approval of Existing Lender to the assumption of the Existing Indebtedness by Purchaser, under terms acceptable to Purchaser in its sole and absolute discretion, provided that Purchaser shall pay any fee or other charges required by the Existing Lender. If Existing Lender does not grant its approval as to the foregoing, (the "Loan Assumption") pursuant to documentation acceptable to Existing Lender and purchaser, each in its respective sole and absolute discretion (the "Loan assumption Documents"), Purchaser or Seller may, at any time thereafter, terminate this Agreement and the Title Company shall return the Deposit to Purchaser, whereupon neither party hereto shall have any further rights or obligations hereunder, except for those which survive the termination of this Agreement.

Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to an entity formed by Purchaser or any entity advised by Purchaser to acquire the Project. Any other assignment may not be made without the consent of Seller.

Subsequently, the parties twice amended the contract. The first amendment to the contract extended Pillar's inspection period until June 15, 2012. The second amendment, which was executed that same day, set forth that Pillar would apply for the assumption and refinance of the loan within fifteen days from the date of the amendment.

Pillar initiated a transfer of physical assets (TPA) and corresponded with Oak Grove Capital[2] and Centennial Mortgage, Inc., both of which responded with engagement letters outlining the terms of the proposed loans. However, neither lender was able to apply to HUD for financing on Pillar's behalf. Pillar made numerous requests to TLC to provide it with financial information so that it could, in turn, provide that information to the lenders in order to receive approval from HUD. However, TLC did not timely provide Pillar with its current financial statements.[3]

On July 15, 2013, TLC sent Pillar a letter terminating the agreement. In September 2013, TLC's counsel sent correspondence to Pillar claiming Pillar defaulted on its obligations under the agreement.

Pillar filed the instant lawsuit alleging breach of contract and promissory estoppel. It further sought a declaratory judgment that (1) the agreement remains in effect and is valid and enforceable, (2) TLC waived any provision that "time is of the essence," (3) TLC is required to convey the property to Pillar upon the completion of HUD financing, and/or (4) Pillar is not in default under the agreement. By its suit, TLC sought specific performance of the contract, delay

---

[2] Oak Grove was the existing lender for TLC.

[3] On November 8, 2012, Pillar received financial statements from TLC, but those statements only reflected a period ending in June 2012, and the record reflects that HUD required the most current financial statements to approve the refinancing.

damages, attorney's fees, and court costs.  The matter proceeded to a bench trial.[4]  Ultimately, the trial court found in Pillar's favor and awarded specific performance under the amended agreement.  It further granted Pillar a monetary award for the net cash flow TLC enjoyed due to delay in executing the contract, as well as an award for the difference in interest rates between July 1, 2013, and the time performance takes place.  The trial court also awarded Pillar attorney's fees.  This appeal followed.

## EVIDENTIARY SUFFICIENCY - CONSIDERATION

In its second issue, TLC argues that the agreement was not supported by adequate consideration because it lacked mutuality of obligation and amounted to nothing more than an agreement to agree.  Thus, it contends that the trial court's findings and conclusions to the contrary are not supported by legally and factually sufficient evidence.

### Standard of Review

In an appeal from a judgment after a bench trial, we accord the trial court's findings of fact the same weight as a jury's verdict.  *Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 302 (Tex. App.–Houston [1st Dist.] 2009, no. pet.); *see Brown v. Brown*, 236 S.W.3d 343, 347 (Tex. App.–Houston [1st Dist.] 2007, no pet.).  Unchallenged findings of fact are binding on an appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding.  *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex. App.–Dallas 2007, no pet.); *see McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Mullins v. Mullins*, 202 S.W.3d 869, 874, 876-77 (Tex. App.–Dallas 2006, pet. denied).  However, when an appellant challenges a trial court's findings of fact, an appellate court reviews those fact findings by the same standards it uses to review the sufficiency of the evidence to support a jury's findings.  *See Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex. App.–Dallas 2006, pet. denied).

---

[4] After the close of evidence, but prior to the trial court's rendition of its judgment, TLC moved for leave to supplement its answer.  Its unverified Second Supplemental Answer included, among other things, the affirmative defenses of lack of consideration, statute of frauds, and lack of contractual standing.  Pillar objected, and the trial court denied TLC's motion for leave.  In addressing the arguments related to these affirmative defenses herein, we assume, without deciding, that the trial court should have granted TLC leave post trial to file its Second Supplemental Answer.  Our addressing these issues does not change the outcome of this appeal, and we, therefore, do not address TLC's arguments concerning the propriety of the trial court's denial of its motion for leave.  *See* TEX. R. APP. P. 47.1.

Thus, to determine whether legally sufficient evidence supports a challenged finding, we must consider evidence that favors the finding if a reasonable factfinder could consider it, and we must disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). This Court may not sustain a legal insufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 203 (Tex. App.–Texarkana 2008, no pet.) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Stanley Works v. Wichita Falls Indep. Sch. Dist.*, 366 S.W.3d 816, 825 (Tex. App.–El Paso 2012, pet. denied). The reviewing court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.*

When considering a factual sufficiency challenge, we consider and weigh all of the evidence, not just that which supports the verdict. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *$132,265.00 in U.S. Currency v. State*, 409 S.W.3d 17, 24 (Tex. App.–Houston [1st Dist.] 2013, no pet.). We will set aside a finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool*, 715 S.W.2d at 635; *$132,265.00 in U.S. Currency*, 409 S.W.3d at 24.

We review conclusions of law by the trial court de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Brown*, 236 S.W.3d at 348. The trial court's conclusions of law are not subject to challenge for lack of factual

4

sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *Id.*

What constitutes consideration for a contract is a question of law. *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.–Tyler 2010, no pet.). But the recital of consideration in a written instrument is not conclusive, and the nature of the real consideration may be shown by parol evidence. *See id.*

## Governing Law

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *See Coker*, 650 S.W.2d at 393; *CBI Indus.*, 907 S.W.2d at 520. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *See Coker*, 650 S.W.2d at 393; *CBI Indus.*, 907 S.W.2d at 520; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker*, 361 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

In interpreting a contract, we must presume that the parties thereto intended every clause to have some effect; therefore, we consider each part of the document with every other part of the document so that the effect and meaning of one part on any other part may be determined. *See Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.–San Antonio 2001, pet. denied). Moreover, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* Finally,

5

we enforce an unambiguous agreement as written. *Id.* We are not permitted to rewrite an agreement to mean something it did not. *Id.* We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *Id.* Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.*

Here, while neither party argues that the agreement is ambiguous, each interprets its language differently, and neither concedes that its interpretation of the relevant passages is any less reasonable than the other party's interpretation of the same. Based on our reading of the relevant sections of the agreement, we conclude that they are not ambiguous.

## Consideration

To be enforceable, a contract must be based on consideration, also known as mutuality of obligation. *See Tex. Gas Utils. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970). Consideration is a fundamental element of every valid contract. *Mosley*, 304 S.W.3d at 628. Consideration is a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting parties. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). The detriments must induce the parties to make the promises, and the promises must induce the parties to incur the detriments. *Id.* Courts strive to construe a contract to promote mutuality and to avoid a construction that makes promises illusory. *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex. App.–Houston [14th Dist.] 2003, no pet.).

Lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties. *Mosley*, 304 S.W.3d at 628. The contract lacking consideration lacks mutuality of obligation and is unenforceable. *Id.* Lack of consideration is an affirmative defense. *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991); *Mosley*, 304 S.W.3d at 628; *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.–San Antonio 2005, no pet.). The existence of a written contract, however, presumes consideration for its execution. *Mosley*, 304 S.W.3d at 628. Therefore, the party alleging lack of consideration has the burden of proof to rebut this presumption. *Id.*; *see also Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. App.–Dallas 1992, writ denied) (op. on reh'g) ("A sworn plea of no consideration placed the burden of proof on Edlund to show there was none.").

A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010).

When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and therefore, no contract. ***Id.***

Thus, when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree. ***Fischer v. CTMI, L.L.C.***, 479 S.W.3d 231, 237 (Tex. 2016); ***Fort Worth Indep. Sch. Dist. v. City of Fort Worth***, 22 S.W.3d 831, 846 (Tex. 2000). If an agreement to make a future agreement is not sufficiently definite as to all of the future agreement's essential and material terms, the agreement to agree "is nugatory." ***Fischer***, 479 S.W.3d at 237. Thus, to be enforceable, an agreement to agree, like any other contract, "must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations." ***Id.***

## Option Agreement

TLC argues that the agreement lacked consideration because Pillar maintained sole and absolute discretion to terminate the agreement. The portion of the agreement about which TLC complains is set forth under Article 3, paragraph 3.9(c) as follows:

> Within ten (10) business days after the Effective Date, Seller shall request the approval of Existing Lender to the assumption of the Existing Indebtedness by Purchaser, *under terms acceptable to Purchaser in its sole and absolute discretion*, provided that Purchaser shall pay any fee or other charges required by the Existing Lender. If Existing Lender does not grant its approval as to the foregoing, (the "Loan Assumption") *pursuant to documentation acceptable to Existing Lender and purchaser, each in its respective sole and absolute discretion* (the "Loan assumption Documents"), Purchaser or Seller may, at any time thereafter, terminate this Agreement and the Title Company shall return the Deposit to Purchaser, whereupon neither party hereto shall have any further rights or obligations hereunder, except for those which survive the termination of this Agreement.

(emphasis added).

Pillar argues that the language in Paragraph 3.9(c) related to the parties option agreement. Earlier in Article 3 of the contract, the parties agreed, in pertinent part, as follows:

> 3.5 In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "Option"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the deposit is returned to Purchaser.

> 3.6 If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by written notice to Seller and Escrow Agent at any time during the Inspection Period and have

the Deposit returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If purchaser does not give Seller and Escrow Agent written notice on or before 7. p.m. Central Time on the last day of the Inspection Period of Purchaser's election to terminate this Agreement, then Purchaser shall be deemed to have exercised its Option to purchase the Project under the terms and conditions of this Agreement, and the Deposit . . . shall not be refundable except pursuant to Sections 9.2 and 10.2.

TLC argues that the language in Paragraph 3.9(c) does not relate to the option agreement, which had expired by the time the parties executed the second amendment to the agreement. Indeed, the second amendment to the agreement states that the option period has expired and that Pillar agrees to apply for the assumption and refinance of the loan within fifteen days from the date of the second amendment. Thus, TLC contends that the opt-out language in Paragraph 3.9(c) is applicable outside of the option period. We disagree.

Paragraph 3.5 expressly sets forth that the option is granted under the terms of Article 3. Paragraph 3.6 states that Pillar may decline to exercise its option to purchase if it decides that the project or any aspect of it is unsatisfactory. The opt-out language about which TLC complains is contained within Article 3, and the process of requesting a loan assumption in Paragraph 3.9(c), undoubtedly falls under the broad description of "any aspect" of the project. Further, according to the terms of Paragraph 3.9(c), TLC was supposed to request approval from the existing lender for the assumption within ten days of the effective date of the agreement, which was well within the thirty day option period.[5]

We further disagree with TLC's contention that the second amendment to the agreement caused the opt-out language in Paragraph 3.9(c) to remain in effect. By the time the second amendment to the agreement was executed, the option period set forth in the agreement had expired. Because the opt-out provisions in Paragraph 3.9(c) were part of this option agreement

---

[5] The "Loan Assumption Documents," which were required to be acceptable to both Pillar and the existing lender, are referenced in the context of the lender's declining to approve the loan assumption. The language of the agreement indicates that the provision places a limitation on the opt-out provision in that before the parties may opt-out of the agreement upon the lender's declining the request for a loan assumption, it must be shown that the loan assumption documents were acceptable to the lender. In other words, the opt-out provision would not apply to a scenario where the loan assumption documents were deemed unacceptable by the lender and the loan assumption request was declined. In any event, opt-out provisions which provide that performance may be excused if it is prevented by causes outside of the parties' control long have been held not to disrupt the mutuality of obligation in a contract. *See Black Hardware Co. v. Mt. Vernon-Woodberry Mills*, 72 S.W.2d 303, 307 (Tex. Civ. App.–Galveston 1934, writ dism'd); *Tex. Seeds & Floral Co. v. Chicago Set & Seed Co.*, 187 S.W. 747, 750 (Tex. Civ. App.–Amarillo 1916, writ ref'd).

and were not undertaken within the option period, TLC would not be able to exercise them outside of the option period.

As a result, we hold that the language in this paragraph does not render the parties agreement void for lack of consideration. TLC's second issue is overruled.

## EVIDENTIARY SUFFICIENCY - PRIOR MATERIAL BREACH

In its third issue, TLC argues that Pillar materially breached the agreement because it failed timely to apply for financing, which excused TLC's performance and the trial court's findings and conclusions to the contrary are not supported by legally and factually sufficient evidence.

"A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.–Houston [1st Dist.] 2010, no pet.). When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 303 (Tex. App.–Houston [14th Dist.] 2017, no pet.). In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994). Excused performance of contract due to the other party's prior material breach is an affirmative defense. *Masson*, 333 S.W.3d at 834.

In the instant case, the trial court found, in pertinent part, as follows:

> 18.    Pillar timely requested and received a commitment for financing from the existing HUD-approved lender and mortgagee of record, Oak Grove Commercial Mortgage, LLC, on or before July 3, 2012.
>
> . . . .
>
> 27.    [Pillar] tendered performance of, or was excused from, performing its contractual obligations under the Agreement for Purchase and Sale and Joint Escrow Instructions as amended.
>
> . . . .
>
> 30.    [Pillar] complied with its contractual obligations under the Agreement for Purchase and Sale and Joint Escrow Instructions as amended.

Additionally, the trial court concluded that Pillar "performed, tendered performance of[,] or was excused from performing its contractual obligations under the Agreement[.]"

As set forth previously, under the second amendment to the agreement, Pillar agreed to apply for the assumption and refinance of the loan within fifteen days from the date of the amendment.[6] "Apply" means to "request or seek." *Apply*, THE AMERICAN HERITAGE COLLEGE DICTIONARY (3rd ed. 2000); *see also Apply*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/apply?src=search-dict-box (last visited Feb. 2, 2018) ("apply" means "to make an appeal or request especially in the form of a written application").

We decline to conclude that the use of the term "apply" required a completed, formalized application process as TLC contends. Had the parties wished that term to require a more formalized process, they could have included language so specifying. Instead, they simply set forth and agreed that Pillar would "apply" for an assumption and refinance of the existing loan. Thus, having considered the unambiguous, plain meaning of the language of the agreement, we conclude that the parties intended that Pillar would "request or seek" an assumption and financing within fifteen days of the execution of the second amendment to the agreement.

The record contains two engagement letters from lenders Oak Grove and Centennial to Pillar outlining proposed financing terms for the purchase of the property. The letter from Centennial is dated June 14, 2012. At trial, TLC's representative, Naveen Shah, testified that by the time Pillar signed the second amendment to the agreement, it had already done what it was required to do with regard to applying for an assumption and refinancing.[7] Centennial's Chief Underwriter Joseph Spina, Jr. testified that there is no formal application for HUD financing akin to the process by which a single family mortgage applicant would seek a loan. He further testified that the engagement letter to Pillar was generated as a result of a request to Centennial. Financial Services Consultant Rhys Heinsch testified that he made a request to Oak Grove on Pillar's behalf that resulted in the engagement letter from it. Based on our review of the record, we have not located any evidence contradicting the legitimacy of these engagement letters.

---

[6] The second amendment to the agreement was executed on June 15, 2012. The fifteen day deadline fell on a Saturday. The first business day following that deadline was Monday, July 2, 2012.

[7] The engagement letter from Oak Grove, dated July 3, 2012, references "TPA Submission & HUD 223(a)(7) Refinancing Loan." At trial, Joseph Spina, Jr., Chief Underwriter for Centennial and HUD lender beginning in 1986, testified that the "TPA Submission" form is "considered [an] assumption."

Thus, we hold that the evidence is legally and factually sufficient to support that Pillar met its obligations under paragraph 4 of the second amendment to the agreement. TLC's third issue is overruled.

## IMPOSSIBILITY

In its fourth issue, TLC argues that the evidence demonstrated as a matter of law that the agreement was void because it was impossible to perform and the trial court's findings to the contrary are not supported by sufficient evidence. TLC states that this argument is made in the alternative in the event that Pillar argues that it could not apply for an assumption and refinance by the time agreed to by the parties. Pillar has argued that it complied with its obligations under the second amendment to the agreement and, as set forth above, we agree. Accordingly, TLC's argument regarding impossibility of performance is of no moment. TLC's fourth issue is overruled.

## RIPENESS AND STANDING

In its fifth issue, TLC argues that the evidence proved as a matter of law that the trial court entered relief that was not ripe for adjudication. It further argues that Pillar lacked standing to assert claims under the agreement because it was "never going to buy the property."

### Ripeness

Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, ***Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.***, 971 S.W.2d 439, 442 (Tex. 1998) (citing ***Mayhew v. Town of Sunnyvale***, 964 S.W.2d 922, 928 (Tex.1998)). Much like standing, ripeness implicates subject matter jurisdiction and emphasizes the need for a concrete injury for a justiciable claim to be presented. ***Patterson***, 971 S.W.2d at 442; ***United Fire Lloyds v. Tippin***, 396 S.W.3d 733, 735 (Tex. App.–Houston [14th Dist.] 2013, no pet.). Standing focuses on who may bring an action, while ripeness examines when that action may be brought. *See Tippin*, 396 at 735–36. In evaluating ripeness, we consider whether, when the lawsuit was filed, the facts were sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. ***Robinson v. Parker***, 353 S.W.3d 753, 755 (Tex. 2011). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." ***Patterson***, 971 S.W.2d at 443. A claim need not be ripe

11

at the time of filing, as long as the party demonstrates a reasonable likelihood that the claim will soon ripen. *See* **Robinson**, 353 S.W.3d at 755. When a case is not ripe at the time it is filed or demonstrably likely to soon ripen, it must be dismissed. *See id.*; **Patterson**, 971 S.W.2d at 442–43.

In the instant case, TLC argues that Pillar's breach of contract cause of action is not ripe because along with its seeking specific performance of the agreement,[8] Pillar also sought an order that TLC must provide underlying information to allow Pillar to obtain the necessary HUD approvals. Thus, TLC contends Pillar only sought information that could permit closing, but before closing could occur, there existed several contingencies such as (1) Pillar's receipt of approval from Oak Grove of its assumption of TLC's existing debt, (2) Pillar's obtaining approval from HUD of its assumption and refinance of the loan, (3) Pillar's obtaining a firm refinancing commitment from a lender, and (4) Pillar's exercise of its discretion to proceed with the contract.

In considering the various contingencies to which TLC refers, we cannot overlook one of TLC's obligations under the unambiguous terms of the agreement. Specifically, TLC agreed that, on or before ten days of the Title Company's receipt of the deposit, it "shall deliver" or "make available" to Pillar certain "Due Diligence Materials. At the end of the list of enumerated materials, TLC agreed to provide or make available "[a]ny other relevant documentation pertaining to the Property that may be in the possession of [TLC] or any vendor and which may be reasonably requested by [Pillar]."

TLC concedes in its brief that both parties understood that the financing Pillar would be pursuing would be HUD financing. The evidence reflects that in order to have its assumption and refinancing approved by HUD, it first had to provide certain current financial information concerning the property from TLC. The evidence further reflects that, within the ten day period following the execution of the agreement, Pillar requested profit and loss statements for the previous three months from TLC, but TLC failed timely to provide pertinent financial information responsive to Pillar's initial or subsequent requests. As a result, Pillar could not seek to perform further after its initial application for an assumption and refinance of the loan.

---

[8] In the prayer of its first amended petition, Pillar sought, among other things, specific performance "ordering TLC to execute and deliver to Pillar a sufficient conveyance of the Property in accordance with the parties' agreement."

12

Where one party to the contract, by wrongful means, prevents the other party from performing, as by making it impossible for him or her to perform, such action constitutes a breach of the agreement, the effect of which not only excuses performance by the injured party, but also entitles him to seek to recover for any damage he may have sustained by reason of the breach. *See Arceneaux v. Price*, 468 S.W.2d 473, 474 (Tex. Civ. App.–Austin 1971, no writ); *S.K.Y Inv. Corp v. H.E. Butt Grocery Co.*, 440 S.W.2d 885, 889–90 (Tex. Civ. App.–Corpus Christi 1969, no writ). Because TLC failed to fulfill its obligation to provide this relevant information pertaining to the property requested by Pillar so that Pillar could meet its remaining obligations under the contract, Pillar was entitled to seek specific performance. *See F.D. Stella Products Co. v. Scott*, 875 S.W.2d 462, 464 (Tex. App.–Austin 1994, no writ) (citing *Wilson v. Woolf*, 274 S.W.2d 154, 158 (Tex. App.–Fort Worth 1955, writ ref'd n.r.e.)) (once there is failure to perform, cause of action in nature of specific performance under contract immediately accrues). Therefore, we hold that the matter was ripe for adjudication.

**Standing**

A party to a contract has standing to maintain a suit on the contract. *Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 820 (Tex. App.–Houston [1st Dist.] 2008, no pet.). It is an elementary rule of law that privity of contract is an essential element of recovery in an action based on contractual theory. *Republic Nat'l Bank of Dallas v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76, 79 (Tex. Civ. App.–Dallas 1968, writ ref'd n.r.e.). Thus, in order to maintain an action to recover damages flowing from the breach of a written agreement it is ordinarily a necessary prerequisite that there be a privity existing between the party damaged and the party sought to be held liable for the repudiation of the agreement. *Id.*

TLC argues that Pillar lacks standing because it ultimately intended to assign its interest to a third party. TLC notes that on the portion of the term sheet from Centennial in which the terms are accepted, Pillar's name has been crossed out and handwritten beneath it is "Foundation for Better Housing, Inc." TLC states that a subsidiary of Foundation for Better Housing, Inc. would be the eventual owner of the property, but never was created.

Pillar does not deny that it ultimately would have assigned the contract to another party. Yet, the fact remains that Pillar undoubtedly was a party to the contract with TLC and, at the point of TLC's breach, had not sought to assign its interests to a third party under the terms of

13

the agreement. Thus, as a party to the agreement, Pillar had standing to bring its breach of contract suit. *See Am. Heritage, Inc.*, 259 S.W.3d at 820.[9] TLC's fifth issue is overruled.

## STATUTE OF FRAUDS

In its sixth issue, TLC argues that the evidence proved as a matter of law that the agreement is void under the statue of frauds. Specifically, it argues that the agreement is void for its failure to include a complete legal description of the property.

The statute of conveyances and the statute of frauds require that conveyances of and contracts for the sale of real property be in writing and signed by the conveyor or party to be charged. *See* TEX. PROP. CODE ANN. § 5.021 (West 2014); TEX. BUS. & COM. CODE ANN. § 6.01(b)(4) (West 2009). In order for a conveyance or contract for sale to meet the requirements of the statute of frauds, the property description must furnish within itself or by reference to another existing writing the means or data to identify the particular land with reasonable certainty. *See Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983); *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972). The purpose of a description in a written conveyance is not to identify the land, but to afford a means of identification. *See Jones v. Kelley*, 614 S.W.2d 95, 99–100 (Tex. 1981); *Apex Fin. Corp. v. Garza*, 155 S.W.3d 230, 237 (Tex. App.–Dallas 2004, pet. denied). If enough appears in the description so that a person familiar with the area can locate the premises with reasonable certainty, it is sufficient to satisfy the statute of frauds. *See Gates v. Asher*, 280 S.W.2d 247, 248–49 (Tex. 1955).

A street address or a commonly-known name for property has been held to be a sufficient property description if there is no confusion. *See Garza*, 155 S.W.3d at 237; *see also Hahhn v. Love*, 394 S.W.3d 14, 26 (Tex. App.–Houston [1st Dist.] 2012, no pet.); *Nguyen v. Yovan*, 317 S.W.3d 261, 268 (Tex. App.–Houston 2009, no pet.); *Butler v. Benefield*, 589 S.W.2d 778, 780 (Tex. Civ. App.–Dallas 1979, writ ref'd n.r.e.); *cf. A.A.A. Realty Co. v. Neece*, 292 S.W.2d 811, 815 (Tex. Civ. App.–Fort Worth 1956), *aff'd*, 299 S.W.2d 270 (Tex. 1957).

Here, the agreement described the property as follows: "The real property located in the City of Grapevine, County of Tarrant, State of Texas . . . together with all existing buildings,

---

[9] TLC focuses its argument on standing in a jurisdictional sense. Considering Pillar's standing in this regard, the record demonstrates that Pillar was, in addition to any other injury for which it may have been entitle to recover, prevented by TLC from exercising its right of assignment under the contract. *See OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 736 (Tex. App.–Dallas 2007, pet. denied) (issue of standing focuses on whether party has sufficient relationship with lawsuit so as to have justiciable interest in its outcome).

structures, fixtures, amenities and improvements thereon situated known as and by the street address 3101 Mustang Drive, Grapevine, TX 76051." Below this description of the property, TLC agreed to convey any right it had to the use of the name "Village on the Creek Apartments" in connection with the property. The record contains no evidence of confusion as to the identity of the property subject to the agreement. Further, TLC presented no evidence that there is more than one tract of land fitting the description in the deed, that it owned other property nearby, or any other evidence indicating that the property cannot be located with reasonable certainty. *See Garza*, 155 S.W.3d at 237 (citing *Butler*, 589 S.W.2d at 780 ("When, however, from the description given, it is reasonably possible to locate more than one tract of land fitting that description, the statute of frauds is not satisfied")). We conclude that TLC failed to demonstrate that the property description does not furnish the means or data by which the land can be identified with reasonable certainty. *See Garza*, 155 S.W.3d at 237. Accordingly, we hold that the property description in the agreement satisfies the statute of frauds. *Id.* TLC's sixth issue is overruled.

<u>SPECIFIC PERFORMANCE</u>

In its seventh issue, TLC challenges the trial court's order granting specific performance on many fronts. First, TLC argues that the trial court erred in ordering specific performance because the evidence is insufficient to support that Pillar was ready, willing, and able to perform. It further contends that Pillar failed to establish a right to specific performance because it failed to obtain a "firm financing commitment." It also argues that specific performance is barred because Pillar sought both damages and specific performance, there is no mutuality of remedy in the contract, and Pillar failed to establish a contract in compliance with the statute of frauds.

**Governing Law**

A contract is subject to specific performance if it contains the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence. *Paciwest, Inc. v. Warner Alan Properties, LLC*, 266 S.W.3d 559, 571 (Tex. App.–Fort Worth 2008, pet. denied); *see Johnson v. Snell*, 504 S.W.2d 397, 398 (Tex. 1973); *Rus–Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927–28 (Tex. App.–Tyler 2007, no pet.) (holding that lack of closing date in option contract did not preclude enforcement by specific performance).

15

Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract. *Paciwest, Inc.*, 266 S.W.3d at 571; *see Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.–Dallas 2007, pet. denied). Moreover, it is essential that the party seeking such relief must plead and prove he was ready, willing, and able to timely perform his obligations under the contract. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008). Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate. *Paciwest, Inc.*, 266 S.W.3d at 571; *Stafford*, 231 S.W.3d at 535.

**Ready, Willing, and Able to Perform**

TLC first argues that the evidence is insufficient to support that Pillar was ready, willing, and able to perform. More specifically, TLC contends that (1) Pillar never filed the TPA application to HUD or even tendered the necessary documents in its possession to facilitate that process, (2) Pillar intended to assign its interest to a third party entity, but there is no evidence that any such entity ever was formed, (3) there is no evidence that Oak Grove will agree to Pillar's assumption of TLC's existing debt, (4) there is no evidence that a new lender will definitively provide refinancing, and (5) there is no evidence that Pillar will accept the assumption and financing terms, if any.

*Governing Law*

As set forth above, it is essential that a plaintiff seeking specific performance show actual performance or an offer to perform that was prevented through no fault of the plaintiff. *See Paciwest, Inc.*, 266 S.W.3d at 572. An actual tender in strict compliance with the provisions of the contract, within the time allowed by the contract, is always required when a contract provides that time is of the essence, unless it is shown that the defaulting party (1) prevented actual tender by the party attempting to perform or (2) when the defendant has repudiated the contract before the time for performance. *Id.* Upon either showing, a party seeking specific performance must only plead and prove that it is ready, willing, and able to perform its part of the contract according to its terms. *Id.*

*Tender of Performance*

As set forth above, TLC breached the agreement when it failed timely to provide or make available current financial information responsive to Pillar's repeated requests. As a result, Pillar

16

had no obligation to tender further performance following its initial application for financing. *See id.* Thus, it was not then required to file the TPA application to HUD or tender the documents in its possession to facilitate that process. *See id.* Moreover, it was not required to assign its interest to a third party entity or to, at this time, form such an entity if it ultimately intended to assign its interest to such an entity. *See id.*

### Ability to Tender Performance

TLC argues that Pillar failed to establish its ability to perform because the evidence conclusively establishes that it did not have a firm financing commitment in place. When a party alleges it is ready, willing, and able to perform under the terms of a contract, but is relying on third party financing, the party must show that it had a firm commitment for financing, or it will not be entitled to specific performance. *See Elijah Ragira/VIP Lodging Group, Inc. v. VIP Lodging Group, Inc.*, 301 S.W.3d 747, 755 (Tex. App.–El Paso 2009, pet. denied); *Luccia v. Ross*, 274 S.W.3d 140, 147 (Tex. App.–Houston [1st Dist.] 2008, pet. denied); *Hendershot v. Amarillo Nat'l Bank*, 476 S.W.2d 919, 920 (Tex. Civ. App.–Amarillo 1972, no writ) (when purchaser is depending on loan from third party who is not bound to furnish funds, purchaser is not able to perform so as to be entitled to specific performance).

In the instant case, Spina testified that the engagement letter he sent Pillar was not itself a firm financing commitment. However, he also testified that in 2012, Centennial was an approved HUD lender for a project located in Grapevine, Tarrant County, Texas, and was able to offer refinancing opportunities to prospective buyers of properties with existing HUD guarantied financing. Spina further testified that in 2012, Centennial had had a business relationship with Pillar and its advised companies for the previous two to three years. According to Spina, the extent of Centennial's relationship with Pillar and its advised companies included thirty-seven loans amounting to approximately one hundred fifty billion dollars. Spina stated that when considering whether to finance a project, Centennial needs information pertaining to property operations and financial statements so it can determine whether the property has the debt service capacity to make loan payments. Spina further stated that Centennial would be the entity to submit the application to refinance to HUD, but in 2012, it had not received sufficient financial statements from TLC to complete that process. Spina testified that HUD required the most current financial statements when Centennial was ready to submit its application to refinance to HUD. But he also testified that based on his review of TLC's 2013 financial statements for the

17

property and considering other information he had received in March 2013, had Pillar been able to supply current statements reflecting the same information, such information would have demonstrated adequate income to allow Centennial to refinance the property and close within a few months. He reached a similar conclusion when considering information current through June 2013. He summarized that the information, had it been current, would have demonstrated that the property "clearly had sufficient cash flow to justify the financing."

A buyer is not required to demonstrate that it had a binding commitment for financing in order to raise a fact issue on its ability to perform under the contract where there is evidence that a third party was willing to lend money for the purchase of the property. *See Lawler*, 269 S.W.3d at 602 (citing *Corzelius v. Oliver*, 220 S.W.2d 632, 635–36 (Tex. 1949)). We again note that the engagement letter from Centennial is not a firm financing commitment. But when considering it in conjunction with Spina's testimony as set forth above, and with the understanding that TLC's failure to timely provide financial information was a critical step preventing Centennial from proceeding with the refinancing process, we conclude that there is sufficient evidence that Pillar had a firm financing commitment, thereby demonstrating its ability to perform.

### *Oak Grove's Willingness to Consent to the Assumption*

TLC also argues that there is no guarantee that Oak Grove would have consented to Pillar's assumption of the loan. Similar to the engagement letter from Centennial, the evidence reflects that the engagement letter from Oak Grove was not a "firm financing commitment." Nonetheless, it is some evidence that Oak Grove was willing to proceed with Pillar's assumption of TLC's loan. Spina testified that refinancing would occur when the current financial information was provided. His testimony suggests that Oak Grove's consenting to the assumption once the necessary financial information is provided by TLC is a foregone conclusion. This evidence must be considered in context with the evidence of the numerous transactions Pillar undertook in and around this time frame. Further, no evidence in the record indicates that Oak Grove had any reservations about consenting to the loan assumption. Therefore, we conclude that the evidence supports the trial court's determination that Oak Grove's consenting to the assumption of the loan was not an impediment to Pillar's ability to perform under the agreement.

18

*Opt-Out Provision*

We next consider TLC's argument that there is no evidence that Pillar will accept the assumption and financing terms, if any. The holder of an option may secure specific performance where the option has been closed according to its terms and, thus, turned into a mutually binding contract. *See San Antonio Joint Stock Land Bank v. Malcher*, 164 S.W.2d 197, 200 (Tex. Civ. App.–San Antonio 1942, writ ref'd w.o.m.). As set forth previously, the opt-out provisions in Paragraph 3.9(c) are part of the parties' option agreement, and Pillar did not elect to opt out within the option period. Therefore, Pillar is not prevented from seeking specific performance on this basis.

*Monetary Award in Addition to Specific Performance*

TLC next argues that the trial court erred in awarding lost net cash flow in addition to the equitable remedy of specific performance. The general rule is that damages constitute an alternative remedy available only when specific performance either is not sought or is not available. *Paciwest, Inc.*, 266 S.W.3d at 574. But in appropriate circumstances, the court may order, in addition to specific performance, payment of expenses incurred by a plaintiff as a result of a defendant's late performance. *Id.*[10] This compensation is not considered breach of contract damages, but rather equalizes any losses occasioned by the delay by offsetting them with money payments. *Id*. The rationale for the compensation is that the contract is being enforced retrospectively and the equities adjusted accordingly. *Goldman v. Olmstead*, 414 S.W.3d 346, 362 (Tex. App.–Dallas 2013, pet. denied). The trial court, in order to relate the performance back to the contract date, may equalize "any losses occasioned by the delay by offsetting them with money payments." *Id.* These losses also may include things such as increased construction costs and increased interest rate on third party financing as a result of delay in the seller's performing its obligations under the contract. *See Paciwest, Inc.*, 266 S.W.3d at 574. Further, a trial court's award of specific performance does not preclude an award of attorney's fees to the prevailing party. *See Tamuno Ifiesimama v. Haile*, 522 S.W.3d 675, 690 (Tex. App.–Houston [1st Dist.] 2017, pet. denied).

---

[10] Texas Rule of Appellate Procedure 41.3, which addresses precedent in cases transferred from one court of appeals to another, mandates that "the court of appeals to which [a] case is transferred must decide the case in accordance with the precedent of the transferor court." TEX. R. APP. P. 41.3; *In re Reardon*, 514 S.W.3d 919, 922 (Tex. App.–Fort Worth 2017, orig. proceeding). The purpose of this rule is to require the transferee court to "stand in the shoes of the transferor court so that an appellate transfer will not produce a different outcome, based on application of substantive law, than would have resulted had the case not been transferred." *Reardon*, 514 S.W.3d at 922–23. Thus, the Fort Worth court's decision in *Paciwest* is binding upon this court in the present case. *See id.*

In the instant case, the trial court's judgment sets forth that Pillar have and recover "delay damages" for lost profits, the difference in interest rates, and attorney's fees. We hold that the trial court could award these types of compensation to Pillar in addition to its award of specific performance. *See Paciwest, Inc.*, 266 S.W.3d at 574; *see also Goldman*, 414 S.W.3d at 362; *Haile*, 522 S.W.3d at 690.

### No Mutuality of Remedy

TLC also argues that Pillar's claim for specific performance is barred because there is no mutuality of remedy in the agreement. Specifically, TLC contends that the agreement fails to bind both parties to perform since "Pillar can choose not to close on the sale by refusing financing terms, but TLC has to close at Pillar's whim."

The absence of mutuality of remedy when the contract is made does not render the promises of the parties any less obligatory and specific performance may be had if such mutuality is thereafter supplied. *Langley v. Norris*, 173 S.W.2d 454, 458–59 (Tex. 1943). Option contracts, by their nature, lack mutuality of obligation and remedy at their inception. *See Smith v. Hues*, 540 S.W.2d 485, 490 (Tex. Civ. App.–Houston [14th Dist.] 1976, writ ref'd n.r.e.). Yet if the option is properly accepted the optionor is bound thereby and the optionee may obtain specific performance. *Id.*; *see also Malcher*, 164 S.W.2d at 200.

As set forth previously, the opt-out provisions in Paragraph 3.9(c) were part of the parties' option agreement, and Pillar did not elect to opt out within the option period. Therefore, specific performance was not barred for lack of mutuality of remedy. *See Smith*, 540 S.W.2d at 490; *Malcher*, 164 S.W.2d at 200.

### Statute of Frauds

Lastly, TLC argues that because the contract did not comply with the statute of frauds, the trial court could not award specific performance. As set forth previously, we have held that the contract satisfies the statute of frauds. *See Garza*, 155 S.W.3d at 237. Therefore, specific performance was not barred on this basis.

### Summation

We are unpersuaded by TLC's arguments that the trial court improperly awarded specific performance to Pillar. TLC's seventh issue is overruled.

In its eighth and ninth issues, TLC argues that the evidence supporting Pillar's monetary award is too speculative, contingent on the actions of third parties, insufficient, and is unsupported by the pleadings.

## Too Speculative and Contingent

To recover damages for breach of contract,[11] a plaintiff must show that the damages sought were the natural, probable, and foreseeable consequences of the defendant's conduct or were within the parties' contemplation. *City of Dallas v. Villages of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.–Dallas 1996, no writ). A party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural. *Id.*

TLC again argues that there is no guarantee that Oak Grove would have consented to Pillar's assumption of the loan. As set forth above, the engagement letter from Oak Grove, while not a firm financing commitment, is some evidence that Oak Grove was willing to proceed with Pillar's assuming TLC's loan. Spina's testimony suggests that Oak Grove's consenting to the assumption once the necessary financial information is provided by TLC is a foregone conclusion. Considering the evidence of the numerous similar transactions Pillar undertook in and around this time and the fact that there is no evidence in the record indicating that Oak Grove had any reservations about consenting to the loan assumption, we conclude that the evidence supports that the trial court's monetary award was probable and not too remote, contingent, speculative, or conjectural.

## Insufficient Pleading

TLC next argues that Pillar's pleadings do not support the monetary award because Pillar did not plead for specific performance of the sale. As set forth previously, in its first amended petition, Pillar prays for "Specific performance ordering TLC to execute and deliver to Pillar a sufficient conveyance of the Property in accordance with the parties' agreement" as well as "delay damages." Thus, we conclude that Pillar's pleadings support the trial court's monetary award.

---

[11] We again note that the trial court's monetary award was not breach of contract damages. *See Paciwest, Inc.*, 266 S.W.3d at 574.

## Including Depreciation in Calculating Award

TLC further argues that the evidence is insufficient to support the award of "lost profits" because the evidence by which these lost profits were calculated included the amount of the property's annual depreciation. In support of its contention, TLC cites *Work v. Commercial Underwriters Ins. Co.*, 61 Fed. Appx. 120, 122 (5th Cir. 2003) (unpublished), in which the court set forth that fixed overhead costs such as depreciation need not be deducted from gross profits to determine lost income damages. *Id.* We are not bound by this holding. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993). And because the court in *Work* was interpreting the calculation of lost income damages under Mississippi state law, we are not persuaded to apply its conclusion to this issue concerning an equitable monetary equalization award under Texas law. *See Work*, 61 Fed. Appx. at 122; *Paciwest, Inc.*, 266 S.W.3d at 574; *see also Goldman*, 414 S.W.3d at 362.

As set forth previously, the court may order, in addition to specific performance, payment of expenses incurred by a plaintiff as a result of a defendant's late performance. *Paciwest, Inc.*, 266 S.W.3d at 574. This compensation is not considered breach of contract damages, but rather equalizes any losses occasioned by the delay by offsetting them with money payments. *Id.* The rationale for the compensation is that the contract is being enforced retrospectively and the equities adjusted accordingly. *Goldman*, 414 S.W.3d at 362. The trial court, in order to relate the performance back to the contract date, may equalize "any losses occasioned by the delay by offsetting them with money payments." *Id.*

In the instant case, Heinsch testified that, as a result of Pillar's not closing its purchase of the property, it lost the net cash flow enjoyed by TLC during 2013 through 2015. He further testified that, TLC's income is inclusive of depreciation and amortization. According to Heinsch, he began with a negative net income on TLC's part, but added back, among other things, the amount of depreciation on the property for that year, to arrive at the cash flow lost by Pillar and enjoyed by TLC. He described depreciation" as a "ledger event," as opposed to a "cash event," meaning that TLC does not lose cash, but rather a reduction of the property's basis. In other words, since depreciation reduces taxable income, it thereby reduces the amount of cash Pillar would pay toward income taxes. Heinsch concluded that the figure at which he arrived is a "conservative estimate of what Pillar lost by not being able to close and enjoy the benefits of the property's operations for three years." We conclude that the trial court reasonably could have

found that Heinsch's calculations of Pillar's lost net cash flow, which exceeded the amount of the trial court's monetary award to Pillar,[12] was an appropriate measure of Pillar's losses occasioned by the delayed performance of the contract. *See id.* TLC's eighth and ninth issues are overruled.

### GRANTING PILLAR'S REQUESTED RELIEF AND DENYING TLC'S REQUESTED RELIEF

In its tenth and eleventh issues, TLC contends that the trial court erred in refusing to render judgment for TLC and award its requested relief because TLC proved its claim as a matter of law. TLC's issues are based on its contention that Pillar committed a prior material breach and TLC is a nonbreaching party. As set forth previously, TLC breached the agreement when it failed to fulfill its obligation to provide the financial information pertaining to the property requested by Pillar so that Pillar could meet its remaining obligations under the contract. Accordingly, we conclude that the trial court did not err in refusing to render judgment for TLC and award its requested relief. TLC's tenth and eleventh issues are overruled.

Finally, in its first issue, TLC argues that the trial court erred in granting Pillar's motion for judgment and denying TLC's motion for judgment. As a result of our analysis of TLC's issues two through eleven, we conclude that the trial court did not err in granting Pillar's motion for judgment and denying TLC's motion for judgment. TLC's first issue is overruled.

### DISPOSITION

Having overruled TLC's eleven issues, we *affirm* the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered March 15, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[12] We note that the trial court's judgment characterizes this award as "lost profits." In its live pleadings, Pillar sought "delay damages" in addition to specific performance. In his testimony, Heinsch described calculations of the net cash flow Pillar lost as a result of the delayed performance of the contract. Regardless of the trial court's characterization of the award, we conclude that the award is supported by the evidence and under the exception set forth in *Paciwest*. *See Paciwest, Inc.* *See* 266 S.W.3d at 574; *see also* **Brown**, 236 S.W.3d at 348 (we review conclusions of law by trial court de novo and will uphold them if judgment can be sustained on any legal theory supported by evidence).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 15, 2018**

**NO. 12-16-00211-CV**

**TLC HOSPITALITY, LLC,**
Appellant
V.
**PILLAR INCOME ASSET MANAGEMENT, INC.,**
Appellee

Appeal from the 48th District Court
of Tarrant County, Texas (Tr.Ct.No. 048-269212-13)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **TLC HOSPITALITY, LLC,** for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*