The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>October 2, 2023</u>

**No. A-1-CA-40056**

**FOUNDATION MINERALS, LLC,**

> Plaintiff/Counterdefendant-Appellant/
> Cross-Appellee,

v.

**MONTIE CAROL MONTGOMERY,**

> Defendant/Counterplaintiff-Appellee/
> Cross-Appellant,

and

**BERT MADERA; DICK MCCALL;
MILDRED MCCALL; PITCHFORK
CATTLE COMPANY, LLC; and
OZARK ROYALTY COMPANY,**

> Defendants.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY
Mark Sánchez, District Court Judge**

Hamm Law Group, PLLC
Jason B. Hamm
Rick G. Strange
Midland, TX

for Appellant

Barnhouse Keegan Solimon & West LLP
Randolph H. Barnhouse
Veronique Richardson
Los Ranchos de Albuquerque, NM

Law Office of Elizabeth Basden PLLC
Elizabeth Basden
Dallas, TX

for Appellee

# OPINION

**WRAY, Judge.**

{1}  In this appeal, we consider whether the district court properly applied New Mexico law to grant partial summary judgment on contract claims and remedies that arose from the parties' dispute over a mineral estate purchase agreement (the MEPA) governed by Texas law and whether, after trial, the district court appropriately entered judgment dismissing both parties' remaining claims. Both parties appeal. We affirm the district court's judgment as to the dismissal of the malicious abuse of process and prima facie tort claims and reverse the pretrial grant of partial summary judgment of all contract-related claims, because we conclude that (1) the MEPA was supported by mutual assent as a matter of law and (2) genuine issues of material fact remain to be decided about the remedy of specific performance.

## BACKGROUND

{2}  Plaintiff, Foundation Minerals, LLC (Buyer), contracted with Defendant, Montie Carol Montgomery (Seller) and her then-husband Bert Madera, for the purchase of Seller's mineral interests. When the transaction did not close, Seller sent Buyer a notice of repudiation, and Buyer filed suit. Buyer's complaint alleged, in relevant part, claims for breach of the MEPA, breach of good faith and fair dealing, declaratory judgment, fraud, fraudulent concealment and constructive fraud, tortious interference with contract, and civil conspiracy, while also requesting the equitable

remedies of specific performance and constructive trust. Buyer also filed a notice of lis pendens and sent the notice, together with the complaint and other documents, to other entities that conducted business related to Seller's mineral and surface interests (the Producer Correspondence). Thereafter, Seller counterclaimed for a declaratory judgment, breach of contract, fraud or misrepresentation, malicious abuse of process, defamation, prima facie tort, and rescission. In relevant part, Seller alleged that dissemination of the Producer Correspondence deprived Seller of a significant income stream and otherwise caused harm.

{3}     The district court granted Seller partial summary judgment after concluding that (1) the MEPA was unenforceable based on the district court's determination that the parties never reached mutual assent about the purchase price; and alternatively, (2) Buyer did not tender performance in the time provided by the MEPA and was therefore not entitled to specific performance. Trial proceeded on the remaining claims that were not contingent on the existence of an enforceable contract. Following trial, the district court dismissed both parties' claims with prejudice, and both parties appeal.

**DISCUSSION**

{4}     We begin with an overview of the parties' arguments in this appeal (Buyer's appeal or the appeal) and cross-appeal (Seller's appeal or the cross-appeal).

{5} In the appeal, Buyer seeks this Court's de novo review of the district court's pretrial partial summary judgment ruling and argues that the MEPA's terms created an enforceable contract as a matter of law or in the alternative, that Buyer presented sufficient evidence to create issues of disputed material fact relating to mutual assent and tender of performance. In response, Seller (1) contends that Buyer did not preserve the claimed errors for our review; (2) contests the standard of review; and (3) maintains that the district court properly granted the motion for partial summary judgment because the MEPA was unenforceable as a matter of law. Seller's arguments on cross-appeal challenge the district court's application of the law to the facts for two of the claims that were tried—malicious abuse of process and prima facie tort.

{6} Before we consider the issues raised in the appeal and cross-appeal regarding the MEPA and the district court's judgment, we first resolve the controversy about preservation and the standard of review.

**I. Buyer Preserved the Challenge to the District Court's Grant of Summary Judgment and Our Review Is De Novo in Light of the Whole Record**

{7} In relevant part, Seller contends that (1) Buyer failed to preserve the issues for appeal; (2) this Court must review the district court's post-trial finding that the MEPA was unenforceable for substantial evidence in the light most favorable to Seller; and (3) alternatively, because Buyer raised the enforceability of the contract in a post-trial motion, this Court should at most review denial of that motion for

abuse of discretion. There is no dispute that Texas law governs the interpretation of the MEPA, and the parties do not contest that New Mexico law applies to the procedural questions involved in this matter. We therefore apply New Mexico law on preservation and standard of review.

## A. Seller's Arguments About Preservation

{8} "To preserve an issue for review, it must appear that a ruling or decision by the [district] court was fairly invoked." Rule 12-321(A) NMRA. Seller contends that Buyer did not preserve the issue of the MEPA's enforceability, because it did not object to entry of the district court's order for partial summary judgment, request post-trial findings of fact on the enforceability of the MEPA, or assert again before entry of the final judgment that the MEPA was enforceable. To the contrary, as we explain, Buyer fairly invoked a ruling from the district court at the partial summary judgment stage and in that manner, preserved these issues for our review.

{9} Buyer asserted in its response to the motion for partial summary judgment that an enforceable contract existed, because there was mutual assent by the parties as to the essential term of purchase price and the disputed material facts supported the remedy of specific performance based on Buyer's repeated offers to close the sale— to tender performance. The rulings by the district court rejected the same arguments Buyer makes on appeal: (1) "[b]ecause the parties had no meeting of the minds to the essential term of price, the [MEPA] is not an enforceable, binding contract"; and

4

(2) Buyer "did not tender performance in the time set by the [MEPA]." *See Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791 (requiring a party to make "a timely and specific objection that apprised the district court of the nature of the claimed error and that allow[ed] the district court to make an intelligent ruling thereon"). Thus, the primary purposes of the preservation rule were satisfied: (1) Buyer specifically alerted the district court to its position that the MEPA was enforceable and that performance had been repeatedly tendered; (2) Seller had an opportunity to respond to Buyer's arguments in district court; and (3) an adequate record was created for our review. *See id.*

{10} The present case involved interrelated claims and counterclaims, some of which were dispensed with at the summary judgment stage and some of which continued to trial and judgment. Seller offers no authority to support the position that in these circumstances, throughout and after trial, a party must continue to assert claims dismissed by partial summary judgment in order to preserve for appeal a challenge to the partial summary judgment order. *See Jones v. City of Albuquerque Police Dep't*, 2020-NMSC-013, ¶¶ 25-26, 470 P.3d 252 (rejecting an argument that the plaintiff acquiesced to a summary judgment ruling by not specifically objecting to additional procedures because the plaintiff had invoked a ruling on the issues raised at summary judgment); *ITT Educ. Servs., Inc. v. N.M. Tax'n & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (denying appellate review

5

because a party cited no authority to support their position). We therefore conclude that Buyer preserved its opposition to the district court's grant of partial summary judgment. *See* Rule 12-321(A).

**B.      Our Standard of Review Under These Circumstances**

{11}      Ordinarily, we review a grant of summary judgment de novo. *See Hernandez v. Grando's LLC*, 2018-NMCA-072, ¶ 7, 429 P.3d 1259. Seller, however, urges us to apply either an abuse of discretion standard to Buyer's post-trial motion or a substantial evidence standard to the findings of fact issued by the district court after trial. To support the position that substantial evidence is the appropriate standard, Seller points to the district court's post-trial finding of fact stating, "It was clear at trial, as it had been when the court ruled on the motion for summary judgment, that the parties were locked into a dispute over the price of the contract—the parties could not agree on the price, on the interest, or on the quantum of interest." Despite this finding and the evidence presented at trial, the contract claims were not tried—the district court dismissed all claims related to the MEPA by partial summary judgment. Before trial, the parties and district court carefully excised the contract-related claims from the proceedings and established a ground rule to avoid the admission of evidence on the MEPA's enforceability. The district court's post-trial finding does no more than reinforce the pretrial partial summary judgment ruling—the district court's view that the MEPA was unenforceable because there was no

6

agreement on price—and our review for Buyer's appeal is limited to that pretrial ruling.

{12} We have already determined that Buyer preserved a challenge to the district court's pretrial order granting partial summary judgment. Thus, because we do not review Buyer's post-trial motion or the district court's findings of fact, we do not employ those associated standards of review. Instead, in the absence of a material factual dispute, we review the partial grant of summary judgment de novo, and in the event of a material factual dispute, "[c]ourts reviewing a motion for summary judgment must review the facts and make all reasonable inferences in the light most favorable to the non[]moving party." *Id.* ¶¶ 6-7. Ultimately, we "balance our determination in support of the parties' right to a trial on the issues." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 15, 123 N.M. 752, 945 P.2d 970.

**II.   As a Matter of Law, the MEPA Was Supported by Mutual Assent and Genuine Issues of Material Fact Remain Regarding Specific Performance**

{13} We apply New Mexico summary judgment law to the district court's ruling. New Mexico courts "disfavor" summary judgment and prefer trial on the merits. *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 242 P.3d 280. Still, a district court may properly grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Guest v. Berardinelli*,

7

2008-NMCA-144, ¶ 6, 145 N.M. 186, 195 P.3d 353 (text only) (quoting Rule 1-056(C) NMRA). After the party moving for summary judgment meets its "initial burden" to refute a necessary element of a claim, "the burden shifts to the non[]moving party to come forward with admissible evidence to establish each element of the claim that has been so negated." *Id.*

{14} Buyer contends that as a matter of law, (1) the parties had a valid, enforceable contract because they agreed to determine the purchase price based on a formula that contemplated a total price based on a title examination of Seller's mineral interests; and (2) Buyer was entitled to specific performance after tendering performance to Seller, in the form of offering to close on multiple occasions. In the alternative, Buyer asserts that questions of material fact remain on assent to purchase price and tender of performance that precluded the district court's grant of partial summary judgment.

{15} Texas law governs the interpretation of the contract. Nevertheless, as Seller acknowledged in the district court, in most respects, Texas and New Mexico law are in harmony on the relevant principles, and we therefore note those similarities as we proceed. To that end, we briefly sketch a broad framework of applicable contract law before we review the terms of the MEPA and then address the parties' arguments relating to contract enforcement and specific performance.

## A. The Applicable Contract Law

{16} Under Texas law, to form an enforceable contract, the following elements must be present: "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 529-30 (Tex. App. 2007); *see also* UJI 13-801 NMRA (defining similar elements of a contract). In the present case, the parties' argument is limited to whether the purchase price was supported by mutual assent—or a "meeting of the minds" as to price. *See Chubb Lloyds Ins. Co. of Tex. v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 151 (Tex. App. 2023) ("Mutual assent is often referred to as the meeting of the minds."). To determine whether there was mutual assent, we look to whether a contract provision is "sufficiently definite to confirm that both parties actually intended to be contractually bound," and whether the agreement's terms were definite enough "to enable a court to understand the parties' obligations, and to give an appropriate remedy if they are breached." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (footnote, internal quotation marks, and citations omitted); *see also Las Cruces Urban Renewal Agency v. El Paso Elec. Co.*, 1974-NMSC-004, ¶ 14, 86 N.M. 305, 523 P.2d 549 (explaining that "[i]t is not even enough that the[ parties] have actually agreed, if their expressions, when interpreted in the light of

accompanying factors and circumstances, are not such that the court can determine" the terms of the agreement (text only) (quoting 1 Arthur L. Corbin, 1 *Corbin on Contracts* § 95, at 394 (1963)).

**B.     The MEPA Terms**

{17}    The terms of the MEPA include:

> 1. Sale of Property. Seller agrees to sell to Buyer and Buyer agrees to buy from Seller of Seller's undivided interest in and to all of the oil, gas and other minerals in and under the lands described in "Exhibit A," attached hereto and made a part hereof by this reference (the "Mineral Estate"), pursuant to the terms and conditions contained herein.
>
> 2. Purchase Price. Buyer agrees to pay Seller for the oil and gas Mineral Estate *$15,535.19 per Net Royalty Acre* (Net Royalty Acre being defined as: The equivalent of 1 Net Mineral Acre being leased at a 1/8th Royalty. For Example: 1 NMA leased at a 1/4th is equal to 2 NRA) owned by Seller in the lands covered by this Agreement (the "Purchase Price"). The final amount of the net royalty acres and thus the total purchase price shall be determined by title examination, and *for the purposes of this Agreement, it is believed that the Seller owns 257.48 Net Royalty Acres for a total Purchase Price of $4,000,000.00.*

We refer to the provision titled, "Purchase Price" as Section 2 or the formula.

Exhibit A defines the "Mineral Estate" subject to the transaction as follows:

> All of Grantor's undivided interest in and to all of the oil, gas, sulphur, and all the other minerals whether similar or dissimilar, including but not limited to oil royalty, gas royalty, overriding royalty, working interest, and royalty in casinghead gas, gasoline, and royalty in any other mineral, on, in and under and that may be produced from lands situated in, including but not limited to, the State of New Mexico, County of Lea, [the following twenty-five tracts of land].

10

Exhibit A includes the legal descriptions of the twenty-five tracts of land and columns that list each tract's gross acreage and corresponding Net Mineral Acres and Net Royalty Acres.

{18} On summary judgment, a "Net Mineral Acre" was described as the net amount of minerals associated with an undivided tract of land. *See Mineral Acre*, *Black's Law Dictionary* (11th ed. 2019) ("The full mineral interest in one acre of land."). Thus, the mineral interests that are used to calculate Net Royalty Acres are defined by Net Mineral Acres and are tied to the surface acres owned by Seller. According to Section 2 of the MEPA, for every Net Mineral Acre that is leased at 1/4 royalty— or 25 percent—Buyer would purchase 2 Net Royalty Acres at a price of $15,535.19 per Net Royalty Acre. Thus, a Net Royalty Acre is calculated according to Net Mineral Acres and the percent royalty interest for the leases of those Net Mineral Acres.

{19} Exhibit A listed a total of 128.74 Net Mineral Acres in the Mineral Estate. Assuming a 25 percent lease on each Net Mineral Acre, Seller further represented in Exhibit A that she owned approximately 257.48 Net Royalty Acres in the Mineral Estate. Exhibit A together with Section 2 explains that a title examination would verify the mineral interests owned by Seller (Net Mineral Acres) as well as the royalty interest (used to calculate the Net Royalty Acres).

11

{20} The MEPA included an additional type of mineral interest, a "non[]participating royalty interest," which the parties agreed was a nonpossessory right to receive royalty payments but not to engage in leasing the interests. Regarding nonparticipating royalty interests, the MEPA stated, "[A]djustments [to the price] will only be made if the Net Royalty Acres increase or decrease based on title examination which shall include confirmation of the assumed 25 [percent] lease royalty on all leases." At summary judgment, Buyer presented testimony that the nonparticipating royalty interests "were to be valued in the same manner as a royalty interest" with the exclusive right to lease the minerals—in other words, at a 25 percent royalty interest. Further, Seller presented evidence on summary judgment that mineral interests that were unleased entirely are commonly also sold at a 1/4 royalty "because more value is placed on unleased mineral interests since the purchaser of the unleased mineral interest is then able to negotiate and enter into its own lease at a 1/4 royalty, as well as the purchaser is able to negotiate and receive lease bonuses on the unleased mineral interests."

{21} The MEPA additionally addresses the timing for closing. Section 6 established that "closing will be held on or before [*twenty*]-*business days after execution of this Agreement*, ('Closing Date'), or on such other date as may be agreeable to the parties hereto." Nonetheless, the MEPA anticipates a curative period to resolve any issues that arise in the title verification process.

7. Title.

    (a)    Objections to Title. In the event Buyer determines title to the Mineral Estate is subject to any encumbrance, defect or issue which renders title to the Mineral Estate unacceptable to Buyer in its sole discretion, then Buyer shall promptly advise Seller of such encumbrance, defect or issue and request that Seller remove or correct the same.

If "Seller fails to remove or correct such issue, defect or encumbrance within sixty (60) days after notice thereof," the MEPA affords Buyer—and Buyer alone—the following rights and options:

    (i)    Grant a reasonable additional time for Seller to remove or correct such issue, defect or encumbrance;

    (ii)    Negotiate a reduction in the Purchase Price, and upon acceptance by all parties, proceed with the Closing at the reduced purchase price.

    (iii)    Waive in writing such title issue, encumbrance or defect or any portion thereof; or,

    (iv)    Refuse to accept title to the Mineral Estate, cancel this Agreement in writing, and obtain a refund of the deposit paid to Seller.

In the event of default by Seller, Section 11 of the MEPA permitted Buyer to seek remedies "afforded by law or equity," including specific performance. If Buyer breached the MEPA, Seller could retain Buyer's deposit, which would be treated as "liquidated damages . . . as Seller's sole remedy for breach."

{22}    With this as background, we turn to the parties' arguments.

13

## C. The Parties' Arguments Regarding Enforceability

**{23}** Buyer contends now, as in the district court, that the formula is sufficiently definite to create an enforceable contract. Seller asserts now, as in the district court, that there was no mutual assent as to price, and therefore no enforceable contract, because Seller and Madera "intended to sell their [M]ineral [E]state for $4,000,000" and nothing less. Seller additionally maintained in the district court that because (1) the formula for purchase price was expressed in Net Royalty Acres, which is defined by the royalty for a leased mineral interest, the formula could not apply to calculate a price for either unleased mineral interests (which clearly have no leases) or nonparticipating royalty interests (which represent only the right to receive a payment under a lease and not to participate in the lease itself); and (2) the MEPA did not separately identify a different purchase price for either. As a result, Seller maintains that the parties reached no mutual assent as to purchase price.

**{24}** "While a meeting of the minds dispute is usually treated as a question of fact, we will treat it as a question of law if the intent of the parties is clear from the face of the document." *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex. App. 2015); *see Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 845 P.2d 1232 ("If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."). Generally, mutual assent "describes the mutual understanding and assent to

14

the agreement regarding the subject matter and the essential terms of the contract," and the parties' mutual assent to "material, essential terms, is a prerequisite to formation of a binding, enforceable contract." *Potcinske*, 245 S.W.3d at 530; *cf.* Restatement (Second) of Contracts: Requirement of a Bargain § 17 cmt. c. (1981) (using "manifestation of mutual assent" rather than "meeting of the minds" because "a mental reservation of a party to a bargain does not impair the obligation he purports to undertake"); *see also* UJI 13-816 NMRA comm. cmt. (noting that "'meeting of the minds'" is a phrase that "'creates problems because it can readily be interpreted to refer to the unconveyed thoughts of the parties'" (quoting *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 1993-NMCA-156, ¶ 43, 117 N.M. 41, 868 P.2d 1266 (Hartz, J., dissenting)).

{25}    Price is an essential term for the sale of mineral interests. *See Stillwell v. Stevenson*, 668 S.W.3d 844, 853 (Tex. App. 2023) (including mineral interests as interests in real property); *Ward v. Ladner*, 322 S.W.3d 692, 697 (Tex. App. 2010) (explaining that "[p]rice is an essential term required for the sale of real property"). Thus, to demonstrate mutual assent and to be enforceable, the MEPA must address the purchase price "with a reasonable degree of certainty and definiteness." *See Fischer*, 479 S.W.3d at 237 (internal quotation marks and citation omitted).

{26}    The parties' mutual assent, and thus the "acceptance of the offer, is measured objectively according to what the parties said and did[, and t]he parties' subjective

15

thoughts and beliefs do not control." *Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App. 2009) (citation omitted); *see also* UJI 13-816 comm. cmt. (explaining that mutual assent is proven by objective, not subjective, evidence). To evaluate the parties' objective actions and determine whether they reached mutual assent, five familiar[1] over-arching principles govern the interpretation of the MEPA: (1) we construe the contract as a whole to determine the parties' purposes at the time of execution; (2) terms are "sufficiently definite whenever the language is reasonably susceptible" to interpretation that avoids forfeiture; (3) we "may imply terms that can reasonably be implied" according to "common usage and reasonable implications of fact"; (4) apparently indefinite terms may be discerned by the "usage of trade or by course of dealing between the parties"; and (5) part performance is an indicator that a contract was formed. *Fischer*, 479 S.W.3d at 238-40 (internal quotation marks and citations omitted).

---

[1]New Mexico contract law applies similar principles. *See C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 15, 112 N.M. 504, 817 P.2d 238 (permitting evidence of trade usage, "course of dealing, and course of performance" to construe ambiguous contractual terms); *Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.*, 2004-NMCA-063, ¶ 14, 135 N.M. 607, 92 P.3d 53 ("A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract." (internal quotation marks and citation omitted)); *Ostrowski v. Barber*, 1998-NMCA-168, ¶ 9, 126 N.M. 184, 967 P.2d 859 ("As a general principle of contract interpretation, an interpretation that reduces a risk of forfeiture is preferred." (alteration, internal quotation marks, and citation omitted)).

{27} Buyer relies on *Fischer* and Seller disputes its relevance. Specifically, Seller contends that the facts in *Fischer* were significantly different than those in the present case. We rely on *Fischer* not to compare factually analogous circumstances but to construct a legal framework to evaluate contract formation where the total purchase price is defined not in definite dollars but by application of a formula to identified factors. Applying these contract formation principles, we conclude that the total purchase price formula is sufficiently definite for the MEPA to be enforceable as a matter of law.

{28} Construed as a whole, the MEPA establishes the parties' purpose is for Buyer to pay Seller for any and all of Seller's mineral interests according to a formula for a total purchase price that would be calculated following title examination that confirmed Seller's interests. *See id.* at 239 (construing the contract as a whole to discern the parties' intent). Exhibit A defines the anticipated scope of Seller's mineral interests that Seller intended to sell and Buyer intended to buy. The formula (i.e., $15,535.19 times each verified Net Royalty Acre), together with a defined procedure to fix the price (title examination to confirm Net Royalty Acres) and a defined scope of the interests to be purchased, results in an especially strong "presumption that the parties intended a reasonable price." *See id.* at 241. Seller's undisputed actions further confirm that the total purchase price was contingent on the title examination process that would verify the ownership interests. Seller

17

attempted to resolve the title issues during the contractual time period to cure title defects under Section 7. In that same time period, Seller also entered into leases, suggesting an intent to demonstrate additional verified royalty interests. *See id.* at 240 ("[T]he parties' actions in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed." (internal quotation marks and citation omitted)).

{29}     Seller argued that the MEPA failed to define a price for unleased interests or nonparticipating royalty interests. We may, however, imply terms from common usage, reasonable implications of fact, usage of trade, or the course of dealing between the parties. *See id.* at 239-40. On summary judgment, Buyer presented undisputed evidence that for unleased mineral interests, a 25 percent royalty rate is "common in the purchase and sale of mineral interests." The MEPA additionally sets forth that nonparticipating royalty interests would be purchased assuming a 25 percent royalty on all leases after title examination confirmed the rate of the royalty interest. Though the nonparticipating royalty interests themselves convey no right to participate in a lease, the right to receive payment under leases would still be determined by the royalty rate in the lease—and would therefore still be subject to confirmation by title examination. As a result, the purchase price term is reasonably susceptible to a sufficiently definite interpretation, which permits enforcement, even if the parties leave the total price open—and no total price is ever reached. *See id.* at

18

241 ("[T]he law may presume that a reasonable price was intended, *even if* 'the price is left to be agreed by the parties and they fail to agree.'" (quoting Restatement (Second) of Contracts: Certainty § 33 cmt. e.)).

{30} The parties agreed that the price would be determined by the formula and the total price was subject to title examination. The MEPA's language unambiguously does not support Seller's asserted subjective belief that she expected to receive a "flat" $4,000,000 regardless of the results of the title examination. *See Franco*, 346 S.W.3d at 608 (rejecting the subjective thoughts and beliefs of the buyer as controlling); *see also* UJI 13-816 comm. cmt. (explaining that mutual assent is proven by objective, not subjective, evidence); *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283 (requiring "an objective manifestation of mutual assent by the parties to the material terms of the contract"); *cf. Mark V, Inc.*, 1993-NMSC-001, ¶¶ 11, 13 (allowing courts to consider "the context in which the agreement was made to determine whether the party's words are ambiguous" and to determine the meaning of ambiguous terms, permitting the fact-finder to "consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement"); UJI 13-825 NMRA (instructing the fact-finder to interpret *ambiguous* contractual terms considering all the circumstances).

{31} The MEPA states in bold text: "*for purposes of this Agreement, it is believed that the Seller owns 257.48 Net Royalty Acres for a total Purchase Price of*

19

*$4,000,000.00.*" The MEPA's terms do not guarantee that Seller would receive a particular dollar amount. Nor does the MEPA offer Seller the opportunity to renegotiate the total purchase price should the Net Royalty Acre calculation yield less than $4,000,000. Instead, the parties unambiguously agreed that (1) a decipherable calculation would yield the total purchase price after a title examination verified Seller's mineral and royalty interests; and (2) should Seller fail to correct any title issues, *Buyer* could grant Seller more time, negotiate a reduction in price acceptable to all parties, waive the title issue, or refuse to accept title to the Mineral Estate and cancel the agreement. For these reasons, we conclude that the objective evidence of the parties' mutual assent demonstrates as a matter of law that the formula was sufficiently definite to create an enforceable contract.

{32}     We hold only that the parties agreed as a matter of law about how to calculate the purchase price. Considerable disputes of fact remain as to other aspects of the transaction. Seller's motion for partial summary judgment on that basis therefore should have been denied and the contract claims should have been tried. We observe that "[m]uch of the factual development necessary to decide the case has likely occurred," and a trial has already been held, which developed a substantial evidentiary record. *See Atherton v. Gopin*, 2015-NMCA-003, ¶ 57, 340 P.3d 630. We discern "no need for the parties to repeat the trial that has already been held" and

20

leave to the district court to determine on remand "the process of evidentiary production" and whether to "rely on the testimony already provided." *See id.*

**D.     There Were Genuine Issues of Material Fact on Buyer's Request for Specific Performance**

{33}     The district court additionally granted summary judgment and dismissed Buyer's request for specific performance based on its determination that Buyer did not tender performance. On appeal, Buyer maintains that it timely tendered performance as a matter of law, or at the least, that genuine issues of fact persist. We agree that summary judgment was improper, because, as we explain, the MEPA did not require actual tender within a certain time and disputed questions of fact remain about whether Buyer otherwise adequately tendered performance.

{34}     Specific performance is an equitable remedy—not a separate cause of action—"that may be awarded at the [district] court's discretion upon a showing of breach of contract." *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App. 2008); *see also Collado v. City of Albuquerque*, 2002-NMCA-048, ¶ 23, 132 N.M. 133, 45 P.3d 73 ("Courts have also used equitable relief to award specific performance in the form of reinstatement to remedy a breach of contract."). In seeking this remedy, it is essential that a plaintiff show tender of performance, either as "actual performance or an offer to perform[,] that was prevented through no fault of the plaintiff." *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 768 (Tex. App. 2018) (denying specific performance because the

plaintiffs failed to tender any money on the date set for the closing of a real estate transaction); *see also Swallows v. Laney*, 1984-NMSC-112, ¶ 18, 102 N.M. 81, 691 P.2d 874 (same). Generally,

> [a]n actual tender in strict compliance with the provisions of the contract, within the time allowed by the contract, is always required when a contract provides that time is of the essence, unless it is shown that the defaulting party (1) prevented actual tender by the party attempting to perform or (2) when the defendant has repudiated the contract before the time for performance.

*TLC Hosp., LLC*, 570 S.W.3d at 768; *see Mercury Gas & Oil Corp. v. Rincon Oil & Gas Corp.*, 1968-NMSC-132, ¶¶ 4, 5, 79 N.M. 537, 445 P.2d 958 (explaining that "time is of the essence though not expressed in the contract" in mineral transactions unless the vendor waived tender by conduct or if "parol modification . . . give[s] rise to estoppel").

{35}    On summary judgment, Seller pointed to the MEPA provision that the parties intended for closing to happen within twenty business days of signing the MEPA and the undisputed fact that the transaction underlying the MEPA did not close. For that reason, Seller asserted that Buyer's request for specific performance failed as a matter of law because Buyer did not timely tender performance either by (1) closing within twenty business days or (2) otherwise offering actual tender of performance. The district court agreed with Seller and ruled that Buyer "did not tender performance in the time set by the [MEPA]. The [MEPA] required timely closing of

22

the sale, which was a condition precedent to the obligation of performance" by Seller.

{36} The MEPA, however, does not "provide[] that time is of the essence," and thus "actual tender in strict compliance with the provisions of the contract"—closing within twenty business days—is not "always required." *See TLC Hosp., LLC*, 570 S.W.3d at 768. We therefore conclude that performance "in the time set by the [MEPA]" was not a strict contractual requirement that, by itself, supported a conclusion as a matter of law that Buyer did not tender performance. Instead, we view Seller's evidence that Buyer did not tender performance within twenty days of execution to be a prima facie showing for the purposes of summary judgment that was then subject to Buyer's rebuttal. *See Berardinelli*, 2008-NMCA-144, ¶ 6; *see also Mercury Gas & Oil*, 1968-NMSC-132, ¶ 5 (providing exceptions to the presumption that time was of the essence in contracts involving mineral properties).

{37} To rebut Seller's prima facie showing, Buyer offered evidence that the parties mutually agreed to extend the closing date, including (1) Seller's continued efforts to confirm mineral and royalty interests; (2) Buyer's offers to close the transaction that were sent to Seller's counsel in August and September 2017, and (3) testimony from Seller's counsel that September 29, 2017, was "a closing date." *Cf. Paciwest, Inc.*, 266 S.W.3d at 573 (applying the summary judgment standard to consider whether the undisputed facts supported specific performance when tender was at

issue); *Mercury Gas & Oil*, 1968-NMSC-132, ¶ 6 ("Where a genuine issue of material fact is present, summary judgment should be denied.").

{38} This evidence demonstrates that a genuine dispute of material fact exists as to whether the parties intended the twenty-day period from signing of the MEPA to be of the essence. *See TLC Hosp., LLC*, 570 S.W.3d at 768. We therefore conclude that summary judgment was also improper on Buyer's request for specific performance.

**III.    The Evidence Supported the District Court's Judgment as to Buyer's Malicious Abuse of Process and Prima Facie Tort Claims**

{39} On cross-appeal, Seller maintains that the district court erroneously applied the law to the facts that were in evidence and therefore improperly denied relief on the counterclaims for malicious abuse of process and prima facie tort. We first take up malicious abuse of process and then consider prima facie tort.

{40} Our continued analysis of the cross-appeal warrants some explanation at this juncture. In light of our reversal of the district court's grant of summary judgment and remand for trial on the contractual issues, there is some logic to simply declining to address the cross-appeal and sending the entire case back for trial. We decide the merits of the tried claims, however, for two reasons. First, the parties and the district court painstakingly excised the claims related to the contract from trial—to the extent that some subparts of the malicious abuse of process claim were tried and some were not. Second, the parties do not seek a different result. Neither party contends that in the event of a reversal of the partial summary judgment, this Court

24

should take any action other than deciding the issues raised in the cross-appeal. We therefore endeavor to do so. *Cf. Atherton*, 2015-NMCA-003, ¶¶ 1, 29-39 (persevering to unravel "a legal Gordian knot" caused by reversal of an early and erroneous grant of partial summary judgment, based on which many additional determinations were made).

## A. Seller's Malicious Abuse of Process Claim

**{41}** The elements of malicious abuse of process are: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 204 P.3d 19. We construe "the tort of malicious abuse of process . . . narrowly," but the *Durham* Court expanded the types of acts that could be considered "use of process," which need not be the initiation of a judicial proceeding. *See id.* ¶¶ 29-30. Improper uses of process can include "(1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment." *Id.* ¶ 29 (alteration, internal quotation marks, and citation omitted). "[I]rregular or improper" uses of process "(1) involve[] a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicate[] the wrongful use of proceedings, such as an extortion attempt." *Id.*

{42}     In the findings of fact and conclusions of law, the district court described Seller's claim as one for "abuse of process." From this, Seller first extrapolates that the district court had the old tort of abuse of process in mind and did not apply the facts to the elements of the new tort, malicious abuse of process. *See id.* ¶ 18 (noting the historic and restated tort claim). This is key, Seller argues, because the old tort would not have permitted a claim arising from the Producer Correspondence, as it did not "initiate[] a judicial proceeding." *See id.* ¶ 29. Seller therefore maintains that all of the district court's findings are inapplicable, because they were made in the wrong legal context and were not specific to the Producer Correspondence.

{43}     Both parties, however, framed their legal positions in written closing arguments and supplied the district court with the correct elements of the claim. Seller sought findings and conclusions related to the Producer Correspondence and argued that the Producer Correspondence supported the elements of a malicious abuse of process claim, including damages arising from lost opportunities and the costs of litigation. The district court did not adopt those findings, and we therefore presume they were rejected. *See Empire W. Cos. v. Albuquerque Testing Lab'ys, Inc.*, 1990-NMSC-096, ¶ 17, 110 N.M. 790, 800 P.2d 725 ("The refusal by the court to accept a requested finding is regarded on appeal as a finding against the party bearing the burden of proof on the issue at trial."). Considering the parties' extensive briefing and submissions using the appropriate terms, we decline to disregard the

district court's findings based on nomenclature. *See O'Brien v. Behles*, 2020-NMCA-032, ¶ 34, 464 P.3d 1097 (noting that the purpose of combining the historical torts "was to preserve them" and they were restated as malicious abuse of process "only for the sake of simplicity and to avoid confusion" (internal quotation marks and citation omitted)).

{44}    Instead, the district court found that

>       19.    [Buyer]'s recourse to the courts was based on good faith beliefs about averments contained in its complaint and though consistent with sharp or aggressive business practice was not motivated by malice or scienter that would expose [Buyer] to liability for malicious prosecution of a civil suit.
>
>       . . . .
>
>       21.    [Seller] failed to carry their burden of proof as to their claims.
>
>       . . . .
>
>       27.    Moreover, the proximate cause of some of the consequences [Seller] claim[s] to have suffered derive from the erratic, confusing behavior on the part of [Seller] (e.g. insistence on a flat dollar amount as the purchase price amidst an agreement with a formula for computation of price, failure to adhere to procedures set forth in the agreement, attempts to rescind when it appeared that performance was called for, and the wholesale alienation of interests to be sold under the agreement to another entity).
>
>       28.    Ultimately, [Seller] assert[s] [Buyer]'s conduct is blameworthy on the ground that it got in the way of the completion of another transaction that was more favorable to [Seller].

29. The damages claimed by [Seller] were speculative, and [Seller] seem[s] to be in [a] better financial position than they would have otherwise been in.

The district court clearly understood, as set forth in finding number 28, that Seller's claim related to the Producer Correspondence and in finding number 29, rejected the evidence of damages. Seller does not challenge the evidence supporting these findings, but instead suggests that special damages are not required to establish malicious abuse of process, because damages may be nothing more than "the costs of the litigation and attorney[] fees for the underlying suit or for the counterclaim." By finding that Buyer's lawsuit was brought in good faith and without malice, the district court implicitly rejected Seller's contention that litigation expenses and attorney fees were appropriate damages for Buyer's initiation of any proceedings. *See DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶¶ 36-38, 124 N.M. 512, 953 P.2d 277 (permitting recovery of "the normal expenses of defending against [an] underlying claim" in the context of "[a] malicious institution of civil proceedings"), *overruled on other grounds by Durham*, 2009-NMSC-007, ¶ 29. Ultimately, the district court found that Seller "failed to carry the[] burden of proof as to the[] claims."

{45} Because Seller does not challenge the evidence supporting the district court's findings related to the insufficient proof of damages caused by Buyer's alleged

28

misuse of process, we hold that the district court properly denied Seller's malicious abuse of process claim and do not address Seller's remaining arguments.

**B.     Seller's Prima Facie Tort Claim**

{46}     To establish a claim for prima facie tort, the plaintiff must show "(1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; (4) and the absence of sufficient justification for the injurious act." *Beaudry v. Farmers Ins. Exch.*, 2018-NMSC-012, ¶ 10, 412 P.3d 1100 (internal quotation marks and citation omitted). In order to balance whether "a party's justification for the injurious act outweighs the culpability of the party's conduct," we measure culpability using three factors and then "weigh the culpability of the conduct against what may justify it." *Id.* ¶ 12. Seller argues that the district court (1) did not consider Buyer's bad faith in disseminating the Producer Correspondence; (2) improperly found that Buyer's acts were justified even though Buyer did not plead justification as an affirmative defense; and did not balance the justification against the injurious act. Seller's claim, however, fails with the district court's findings to which we have already referred— "[Seller] assert[s] [Buyer]'s conduct is blameworthy on the ground that it got in the way of the completion of another transaction that was more favorable to [Seller]" and "[t]he damages claimed by [Seller] were speculative, and [Seller] seem[s] to be in [a] better financial position than they would have otherwise been in." Seller does

29

not challenge the evidence supporting these findings, which indicated that the alleged intentional act by Buyer—disseminating the Producer Correspondence—did not cause any injury to Seller. *See id.* Because these unchallenged findings support the district court's dismissal of Seller's prima facie tort claim, we hold that the district court properly dismissed the prima facie tort claim and do not address Seller's remaining arguments.

**CONCLUSION**

{47}    For the foregoing reasons, we reverse the district court's grant of partial summary judgment on the contract-related claims and otherwise affirm.

{48}    **IT IS SO ORDERED.**

_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

_____
**SHAMMARA H. HENDERSON, Judge**

_____
**MICHAEL D. BUSTAMANTE, Judge,**
**retired, Sitting by designation**